IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

MARYBETH LEAMER, as
Trustee of the Marybeth Leamer
Lifetime Trust,

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

Appellant,

CASE NO. 1D13-4573

v.

MARILYN B. WHITE and
OMNI AMELIA ISLAND LLC, a
foreign limited liability company,

Appellee.

_____/

Opinion filed January 27, 2015.

An appeal from the Circuit Court for Nassau County.
Brian J. Davis, Judge.

J. Thomas McKeel, Fernandina Beach, for Appellant.

John R. Hamilton of Foley & Lardner LLP, Orlando; Scott D. Richburg of Foley &
Lardner LLP, Jacksonville, for Appellee Omni Amelia Island LLC.

Arthur I. Jacobs, Richard J. Scholz and Yvonne R. Mizeras of Jacobs, Scholz &
Associates, LLC, Fernandina Beach, for Appellee Marilyn B. White.

MAKAR, J.

If good fences make good neighbors, what do yard lights make? Answer:
This litigation in which neighboring townhouse owners scuffle over a yard lighting
system to which one strenuously objects. The trial court granted summary

judgment for the objector, Marilyn White,[1] as well as Omni Amelia Island LLC (Omni), whose architectural review board interpreted its covenant against "ostentatious site features" as granting Ms. White a veto over any lighting system that her neighbor, Marybeth Leamer, might propose. As explained below, we conclude that the trial court erred in its interpretation of the covenant.

I.

The beatific Long Point neighborhood at the center of this controversy is a private subdivision within the Amelia Island Plantation at the southern tip of the island, bordering the marshlands of Nassau Sound. The Whites and Leamers live in adjoining luxury waterfront townhouses that share views of the Intracoastal Waterway—they also share a common wall. Their townhouses are among the five currently built on the ten townhouse lots that are subject to a "Declaration of Covenants, Conditions, Restrictions, and Easements for The Pointe at South Pointe" (the Covenants). The restriction at issue in this dispute is section 3.17, which deals with landscaping, lighting, and service courts. Subsection (b) of that covenant provides, in relevant part:

---

[1] Initially this dispute involved the husbands, Mr. Gerald White and Mr. Fred Leamer, but both were dropped from this litigation prior to final judgment as named parties because neither is listed as an owner of the two townhouses (their respective wives replacing them as named parties). For simplicity, we will refer generally to the owners/parties as Mr. Leamer and Mr. White because it is their names that appear on most of the relevant emails, letters, and other correspondence regarding the matter.

(b) <u>Ostentatious Site Features</u>. The construction of ostentatious site features *such as* topiary, sculpture, free standing fountains in the foreground of townhouses *or lighting systems which may be offensive to adjacent neighbors is unacceptable*.

(Emphasis added). The italicized language is the focal point of the parties' squabble, which began in May 2012 when Mr. Leamer had landscape lighting installed on his side of the property. He did so without submitting the requisite fee and application for approval by the Amelia Island Plantation Architectural Review Board, which is controlled by Omni. Deeming the lighting offensive, Mr. White complained to the Board, the management of which is one of the many responsibilities of Mr. William Moore, Omni's director of planning and development. The Board's responsibility is to review plans submitted by homeowners and approve them if they comply with the Covenants; the Board has no enforcement authority and does not canvass the neighborhood for violations.

In response to Mr. White's complaint, Mr. Moore spoke about the situation with Mr. Leamer, who lives part of the time in the Atlanta, Georgia area. Soon thereafter in June 2012, Mr. Moore wrote to Mr. Leamer to explain that progress had been made as to the specific objections Mr. White had about the lighting, such as mitigating "light spillage." He explained that a "procedural" problem existed, which could be corrected by Mr. Leamer submitting a fee along with an application and plan for the Board's review. As a part of this submission, however, Mr. Leamer was required to submit "statements from the two adjacent property

3

owners that your proposed plan for outdoor lighting is acceptable to them and they do not find it offensive." The Board deemed these statements as necessary because section 3.17(b) was a "unique provision" that "provides neighbors with a veto over the installation of your lighting." Mr. Moore characterized the "neighbor veto" as a "substantive problem" over which the Board had no control, but suggested modifications to the lighting plan to assuage Mr. White, such as using "moon glow" effects rather than "hot spot" lighting, turning off the system entirely when not present, and so on. He encouraged reaching an accommodation with Mr. White.

In response, Mr. Leamer took the position that no fee, application, or plan would be forthcoming because other similar lighting systems existed on home sites in the Long Point community that had not been approved by the Board (which was apparently the case for some non-townhouse properties). The Board met to discuss the situation and followed up with a July 18, 2012, letter from Mr. Moore, who again said that Mr. Leamer must submit an application, noting that no property owner is "authorized to unilaterally decide what provisions they may want to follow and what provision[s] they want to ignore."

Mr. Leamer capitulated by submitting the necessary fee and paperwork, which became the focus of a Board meeting on August 14, 2012, at which Mr. White objected to the plan. In its letter sent a week later, the Board found the

4

current lighting plan was "generally consistent" with its standards except, for example, that some driveway lights close to the property line "need to have the intensity reduced or dialed back." It again noted that it deemed itself powerless to approve any plan unless Mr. White withdrew his ongoing general objection to the lighting plan. The Board said it "would like to find a resolution to this issue without any party having to resort to a judicial solution," suggesting it would approve a slightly modified plan that Mr. White "seemed willing" to consider "but made no commitment." It concluded by saying that the two neighbors "need to talk" ("Perhaps a little personal communication at this stage would be fruitful to both of you") and reemphasizing its view that "it must abide by" section 3.17(b) "as long as it remains a part of the documents."

The Board's ambassadorial efforts did not pay off. In early September, Mr. White filed a lawsuit against Mr. Leamer alleging that the landscape lights were "excessively bright and positioned such that they shine onto [his] property and into [his] home between dusk and midnight everyday regardless of [Mr. Leamer's] presence in the home." He further complained that the lighting "flooding in [his] home" was a source of "serious discomfort, distress and inconvenience" to him and also to "any person of normal sensibilities." The lighting caused "serious annoyance and discomfort as well as mental and physical distress." He sought a

5

temporary and permanent injunction restraining Mr. Leamer from operating the outdoor lights.

In the interim, Mr. Leamer made the suggested changes to the lighting plan, which the Board now deemed to be consistent with its standards. The Board's December 3, 2012, letter to Mr. Leamer explicitly acknowledged the lighting plan was acceptable and would be approved but for Mr. White's continuing objections. ("Your neighbor has clearly stated that he finds all outdoor lighting of the type installed to be offensive to him.") For this reason, the Board refused to approve the modified plan "unless your neighbor provides written documentation that the lighting as currently installed is acceptable to him or a judge strikes" section 3.17(b) from the Covenants.

Once again, the Board's diplomatic approach failed and the impasse between the neighbors devolved into dismissal motions and counter-claims (one that made Omni a party to the litigation), answers and defenses, and a deposition of Mr. Moore, as manager of the architectural review board process. His conciliatory letters tried to keep the Board at arm's length from the neighbors' dispute while tactfully brokering a détente, but now both he and the Board were enmeshed in the property owners' litigation.

Mr. Leamer moved for summary judgment, seeking a legal ruling that the Board's interpretation of section 3.17(b), which required the written approval of

his neighbors, was arbitrary and unreasonable. Omni responded with its own motion for summary judgment, joined by Mr. White, seeking a ruling that its interpretation should be upheld. In response, the trial judge denied Mr. Leamer's motion, entered an unadorned final summary judgment in favor of Omni and Mr. White, and subsequently awarded Omni its attorneys' fees and costs, which were approximately $32,000. This appeal followed.

II.

Florida is perhaps ground zero in legal battles between homeowners' associations and property owners over the interpretation and enforceability of private restrictive covenants, which are commonly used in newer subdivisions, large developments, and condominium communities. See John N. Redding, Florida Real Property Transactions § 10.31 (7th ed. 2013). The State's burgeoning population, the desirability of maintaining uniform aesthetics and architectural standards within a community, and the protection of property values from detrimental activities, have made restrictions on the use of property pervasive statewide.

In a world without restrictive covenants, architectural review boards, and a court system, neighboring property owners such as the Leamers and Whites would have to resolve their disputes privately and cooperatively, a timeless and pervasive method by which order informally and sometimes spontaneously arises without

7

resort to legal process. See Robert C. Ellickson, Order Without Law: How Neighbors Settle Disputes 4-6 (1991). But human nature prevails; differences arise that cannot be resolved without an umpire. What one homeowner sees as clear and unambiguous restrictions are viewed as cloudy and equivocal by another, leading to disputes that force courts to interpret them. Florida's appellate courts have weighed in on covenants affecting vehicle signs,[2] satellite dishes,[3] and even a terra cotta plaque.[4] Yard lights now join this list.

A benefit of our State's jurisprudence on restrictive covenants is that the framework for resolution of this type of dispute is well-established. To begin, we review and interpret the language of the restrictive covenant de novo, meaning we are not bound to the trial court's view and are free to draw our own legal conclusion about the meaning of the language used. See Klinow v. Island Court at

---

[2] Shields v. Andros Isle Prop. Owners Ass'n, Inc., 872 So. 2d 1003, 1006 (Fla. 4th DCA 2004) (signs placed on inside windows of homeowner's vehicle do not violate covenant against vehicles with "no lettering or signage thereon"); Wilson v. Rex Quality Corp., 839 So. 2d 928 (Fla. 2d DCA 2003) (restrictive covenant did not prevent residents from parking their company's vehicle in driveway).

[3] Killearn Acres Homeowners Ass'n, Inc. v. Keever, 595 So. 2d 1019 (Fla. 1st DCA 1992) (satellite television dish is a "structure" subject to restrictive covenant, which architectural review board applied fairly by prohibiting in front and side yards).

[4] Lakeridge Greens Homeowners Ass'n, Inc. v. Silberman, 765 So. 2d 95 (Fla. 4th DCA 2000) (hanging of 2' x 4' terra cotta plaque, "which depicts three, clothed cherubs pouring water from a pail," subject to approval of community architectural control board).

Boca W. Prop. Owners' Ass'n, Inc., 64 So. 3d 177, 180 (Fla. 4th DCA 2011). In doing so, we must make a judgment about the meaning of section 3.17(b) in the context of this townhouse community.

Our opening observation is that section 3.17(b) establishes a general principle: the "construction of ostentatious site features" is "unacceptable." The key words are "ostentatious" and "unacceptable," which raise two interpretive difficulties. First, it is not at all clear what ostentatious means in this context. See The New Shorter Oxford English Dictionary 2030 (1993) ("1. Characterized by ostentation; intended or intending to attract attention or admiration, esp. of wealth or luxury; pretentious, showy. 2. Likely to attract attention; conspicuous."). What standards are to guide Long Point townhouse owners as they make landscaping, lighting, and service court decisions? Second, unclear is who is to judge that which is ostentatious and thereby "unacceptable" versus that which is not? Ostentatious, like beauty, is often in the eye of the beholder, so it helps to know who is tasked with the beholding.

Preliminarily, we reject as unreasonable that section 3.17(b) was intended to prohibit *any* lighting system, no matter how benign, that "may be offensive to adjacent neighbors." Instead, we read that portion of section 3.17(b) which says that items "*such as* topiary, sculpture, free standing fountains in the foreground of townhouses or lighting systems which may be offensive to adjacent neighbors" as

9

setting forth non-exclusive illustrative examples of the types of features that can be prone to excessiveness, but are not per se ostentatious. Hedges discreetly pruned to look round, square, or geometric could be deemed topiary because they are clipped to form "ornamental shapes." See The New Shorter Oxford English Dictionary 3341 (1993) (topiary defined as "concerned with, involving, or formed by the clipping of shrubs, trees, etc., into ornamental, geometric, animal or other shapes"). Yet they are ubiquitous in gated and other privately-restricted communities. Intricately carved and unobtrusively placed pathway stones are a form of sculpture, id. at 2739 (sculpture defined as the "art or process of creating . . . representational or abstract forms in the round, in relief, or (formerly) in intaglio [etching], by chiseling stone, casting metal, modeling clay, or some other plastic substance, carving wood, etc., or, now also, by assembling separate parts"); they too are not necessarily ostentatious.

The definitional breadth of what may constitute topiary and sculpture suggests that aesthetic line-drawing is necessary. Whether it be topiary or sculpture, a judgment has to be made whether the potentially offending site feature is sufficiently "ostentatious" to warrant banishment. To interpret the sentence otherwise would prohibit all topiary and all sculpture no matter how understated. We see no indication that the Board desires to ban non-ostentatious displays of topiary and sculpture; to do so would throw the baby out with the bathwater.

10

For parallel reasons, the determination of whether a lighting system that "may be offensive to adjacent neighbors" is "ostentatious" likewise requires the exercise of aesthetic judgment; the question here is by whom? The Board says the language in this phrase eliminates its discretion; it has no power to approve a lighting system that any adjacent neighbor dislikes. We find no basis for reading this language as creating veto power. Nothing in section 3.17(b) or elsewhere in the Covenants clearly and unequivocally gives "adjacent neighbors" a right to veto any proposed lighting system they find personally and subjectively offensive. If such a power was intended, it has not been explicitly stated; nor can we infer it from the language used. The ordinary meaning of section 3.17(b) does not establish an across-the-board veto by one neighbor over another's use of her property; no textual basis exists for such a severe restraint. To impute such a restriction would cut against the principle that such restraints "are not favored and are to be strictly construed in favor of the free and unrestricted use of real property." Wilson v. Rex Quality Corp., 839 So. 2d 928, 930 (Fla. 2d DCA 2003) (citing Moore v. Stevens, 106 So. 901, 903 (1925)); see also Lathan v. Hanover Woods Homeowners Ass'n, Inc., 547 So. 2d 319, 321 (Fla. 5th DCA 1989) ("[R]estrictive covenants are strictly construed against those who assert the power to limit the homeowner's free use of his land.").

A restrictive covenant "will be enforced according to the intent of the parties as expressed by the clear and ordinary meaning of its terms." Shields v. Andros Isle Prop. Owners Ass'n, Inc., 872 So. 2d 1003, 1005-06 (Fla. 4th DCA 2004); accord Klinow, 64 So. 3d at 180 ("In determining the enforceability of an amendment to restrictive covenants, the test is one of reasonableness."). The most reasonable interpretation of section 3.17(b) is that the Board wields the authority and exercises the discretion to determine whether a lighting system is "ostentatious," and that the phrase "may be offensive to adjacent neighbors" merely makes a neighbor's sensibilities an important factor, but not a decisive one, in the Board's decision. This interpretation ensures that aesthetic concerns can be met by the Board without judicially engrafting a neighbor's veto into the restriction. Though section 3.17(b) clearly does not contain such a veto, we note that as the drafter and enforcer of the restriction, any claimed ambiguity in section 3.17(b) would be construed against the Board and the Whites, respectively. Shields, 872 So. 2d at 1006; Hurt v. Leatherby Ins. Co., 380 So. 2d 432, 434 (Fla. 1980) ("Generally, ambiguities are construed against the drafter of the instrument.").

In holding that section 3.17(b) cannot be read to include a neighbor veto, we note that Mr. Moore testified that the "idea" for requiring neighbor approval "was basically a decision of the [Board]" that was not explicitly in the Covenants, which

12

cannot be altered by the Board unilaterally. The Board feared it might get enmeshed in litigation and thereby "become the focus of the issue rather than keeping the issue between the two owners." While the Board may have believed that compulsory neighbor-approval was the better course to keep the Board out of such disputes (and out of court), a more clearly worded restriction would be necessary under the longstanding legal principles that guide courts in these types of enforcement actions.

We have no quibble with the Board's point that townhouse living, particularly for contiguous wall-sharing owners, presents unique personal compatibility concerns that may have been the unstated motivation for section 3.17(b). The Board felt that section 3.17(b) was unique because it "only exists in this one subdivision for this limited group of townhouses" and, in its view, left the Board with no authority to approve a lighting plan in the face of a neighbor's objection, no matter how unreasonable. Our construction of section 3.17(b)'s language, however, does not defeat its central purpose of ensuring that the concerns of neighboring townhouse owners are taken into account. See Robins v. Walter, 670 So. 2d 971, 974 (Fla. 1st DCA 1995) ("[W]hile we are aware that restrictive covenants should be narrowly construed, they should never be construed in a manner that would defeat the plain and obvious purpose and intent of the restriction."). To the contrary, much elbow room is left to achieve an aesthetically

acceptable lighting plan that meets community and neighborly norms without the interlineation of a veto power. The natural reading of section 3.17(b) is that the Board must consider in its calculus the views of neighbors who may be (or are) offended. The Board may give this factor significant weight, but it cannot give it conclusive or exclusive weight. Other factors, such as the Whites' concerns about the adverse effects of nighttime light intrusion on their home and the Leamers' desire to have safety lights left on when they are away to ward off burglars (some of whom may surreptitiously use their elongated dock at night to gain entry to the townhouses), should be put on the Board's decision-making scale. As it does in other contexts, the Board must render a measured judgment about the importance of the concerns expressed and render the ultimate decision on what to approve as reasonable. Indeed, it appears to have done just that here. After various modifications to the Leamers' lighting plan, the Board deemed it reasonable and accorded it conditional approval. But for the Whites' veto, the Board adjudged the new and improved lighting plan as an acceptable one.

## III.

In closing, we note that our holding, which finds no support in the restrictive covenants for an adjacent-neighbor veto, requires the Board to make the ultimate determination regarding whether a proposed lighting system complies with section 3.17(b). The Board has been making judgment calls about the reasonableness of

14

lighting systems elsewhere in the community, so we are confident that it can navigate between the Scylla of restrictive covenants and the Charybdis of neighbors' sensitivities in this case as well. Because section 3.17(b) does not grant the power to veto an adjacent neighbor's lighting system, the entry of summary judgment against the Leamers was error. We reverse and vacate the final judgment on that basis, and direct entry of judgment for the Leamers on their motion for summary judgment (which sought a ruling that no neighbor veto existed) except as to their selective enforcement claim for which we find no error. See Killearn Acres Homeowners Ass'n, Inc. v. Keever, 595 So. 2d 1019 (Fla. 1st DCA 1992).

REVERSED IN PART, AFFIRMED IN PART.

RAY and OSTERHAUS, JJ., CONCUR.